**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| |
|---|
| **HAROLD SCOTT GURVEY**<br><br>           **PLAINTIFF,**<br><br>**v.**<br><br>**TOWNSHIP OF MONTCLAIR NEW JERSEY; MONTCLAIR POLICE DEPARTMENT; CAPTAIN EMIL DUL; CAPTAIN SCOTT BUEHLER; LIEUTENANT ROBERT ROMITO OFFICER THOMAS PATTI; OFFICER ROBERT HANSFIELD; OFFICER KEITH LUMPKIN; OFFICER GLENDA RIVERA; POLICE DOES 1-10, SUED INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES**<br><br>           **DEFENDANTS** |

Civ. No. 19-17525 (KM)(ESK)


**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Harold Scott Gurvey alleges that officers of the Montclair Police Department (the "Police Department") violated his constitutional rights when they entered his residence without a warrant, which entry was followed by an unwanted psychiatric examination upon suspicion that he was suicidal. Accordingly, Gurvey, proceeding *pro se*, asserts claims against the Township of Montclair, New Jersey ("Montclair"), the Police Department,[1] Captain Emily

---

[1]     Technically, the claims against the Police Department must be asserted against the Township of Montclair itself. A police department is not an independent entity with the capacity to sue and be sued, but only "an executive and enforcement function of municipal government." N.J. Stat. Ann. § 40A:14-118. Thus, Section 1983 case law consistently holds that the proper defendant is the relevant municipality and not the police department. *See Jackson v. City of Erie Police Dep't*, 570 F. App'x 112, 114 n.2 (3d Cir. 2014) ("We further agree with the District Court that the police department was not a proper party to this action. Although local government units may constitute 'persons' against whom suit may be lodged under 42 U.S.C. § 1983, a city police

1

Dul, Captain Scott Buehler, Lieutenant Robert Romito, Officer Thomas Patti, Officer Robert Hansfield, Officer Lumpkin, and Officer Glenda Rivera under 42 U.S.C. § 1983 and New Jersey state law.[2]

Now before the Court are Defendants' motion for summary judgment and motion to bar Plaintiff's expert reports and testimony (DE 32-1), as well as Gurvey's cross-motion for summary judgment against the Defendants (DE 33-2). For the following reasons, Defendants' motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**, Defendants' motion to bar Plaintiff's expert reports is **DENIED**, and Gurvey's cross-motion for summary judgment is **DENIED**.

---

department is a governmental sub-unit not distinct from the municipality of which it is a part.") (citation omitted); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997) (Court "treat[s] the municipality and its police department as a single entity for purposes of section 1983 liability.") The clerk is directed to dismiss the Police Department from the case, but there is no change in substance.

[2]     Citations to certain items in the record will be abbreviated as follows:

"DE" = Docket entry number in this case.

Compl. = Plaintiff's Complaint (DE 1)

Def. MSJ = Defendants' Motion for Summary Judgment (DE 32-1)

Def. SOMF = Statement of Undisputed Facts in Support of Motion for Summary Judgment and Motion to Bar Plaintiff's Expert Reports and Testimony on Behalf of Defendants (DE 40-3)

Pl. MSJ = Gurvey Cross-Motion for Summary Judgment (DE 33-2)

Pl. SOMF = Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment (DE 33-5)

Pl. Opp. = Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (DE 34-1)

Pl. RSOMF = Plaintiff's Response to Defendants' Statement of Undisputed Facts (DE 34-2)

Def. Opp. = Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment and in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Motion to Bar Plaintiff's Expert Reports and Testimony on Behalf of all Defendants (DE 35)

Def. RSOMF = Response to Plaintiff's Statement of Facts (DE 35)

Pl. Reply = Plaintiff's Brief in Reply to Defendants' Opposition to His Motion for Summary Judgment

## I.   BACKGROUND

### A. Facts

The following facts are set forth in the parties' submissions; where the parties dispute a factual matter, the dispute is noted.

On August 31, 2018, Dr. Patricia Marino called the Police Department to request a wellness check for Gurvey. (Def. SOMF ¶1.) Dr. Marino reported that she received a call from Mr. Gurvey's spouse, Amy R. Weissbrod Gurvey. (Def. SOMF ¶5.)[3] According to Dr. Marino, Ms. Gurvey "sounded distressed, erratic, and was calling to request help for her husband," who Ms. Gurvey claimed was suicidal. (Def. SOMF ¶¶ 6-7.) Dr. Marino informed the police that she advised Ms. Gurvey to call 911, but Ms. Gurvey replied that the Plaintiff "would shoot somebody" if she called 911 as Dr. Marino advised. (Def. SOMF ¶ 8.) Finally, Dr. Marino told the Police Department that Ms. Gurvey was requesting an appointment for a psychiatrist, that she did not want anyone to come to their residence, and that the Plaintiff "was going to kill himself." (Def. SOMF ¶9.)[4]

In response to Dr. Marino's call, the Police Department dispatched squad cars 203 and 217 to Gurvey's home to perform a wellness check. (Def. SOMF ¶11.) Dispatch told the officers that Gurvey was suicidal and could harm whoever came to help. (Def. SOMF ¶ 12.) The responding officers were Captain Dul, Lieutenant Romito, Officer Rivera, Officer Hansford, Officer Patti, and Officer Lumpkin (the "Officers"). (Def. SOMF ¶¶ 13.)

What happened next is in some dispute. Defendants contend that the Officers arrived at Gurvey's home and that Ms. Gurvey refused to open the locked screen door when requested to do so. (Def. SOMF ¶14.) On the other

---

[3]    Intending no disrespect, I will refer to Harold Gurvey as "Gurvey," or "Mr. Gurvey," and I will refer to Amy Gurvey as "Ms. Gurvey." I note variant spellings of Ms. Gurvey's middle name in the record, but I here assume the accuracy of the spelling in Mr. Gurvey's moving brief.

[4]    With respect to Dr. Marino's phone call to the Police Department, Defendants submit this statement not to prove the truth of the matter asserted—which would constitute hearsay—but to explain the basis for the Officers being dispatched to Gurvey's residence.

hand, Gurvey claims that the Officers met Ms. Gurvey at the front door and that she asked the Officers to wait while she put on a shirt.[5] (Pl. SOMF ¶12.) At any rate, there is agreement that the door was locked, and that the Officers forced their way in. (Def. SOMF ¶17; Pl. SOMF ¶13.)

At the time the Officers entered the home, Gurvey had just gotten out of the shower. (Def. SOMF ¶18.) The Officers confronted Gurvey in his bedroom, located on the second floor. (Pl. SOMF ¶15.) Gurvey was unaware that the Officers were in his home until he saw them in his bedroom. (DE 32-4, Ex. C, Deposition of Plaintiff Harold Gurvey, T58:24-59:02.)

Upon realizing that the Officers were in his bedroom, Gurvey, who was on the phone, stated: "you ought to call the FBI or something." (Def. SOMF ¶21.) Gurvey also asked the Officers "what the hell" they were doing in his bedroom. (Def. SOMF ¶22.) The Officers explained to Gurvey that they were responding to a call claiming that he was suicidal and constituted a threat of harm to others, and requesting a wellness check. (Def. SOMF ¶23.) While the

---

[5]   In more detail, Ms. Gurvey's version of the events at the door of the house is as follows:

> [The police] came with box cutters or whatever it is, and a whole bunch of them came to the door. I was standing there with a towel on . . . , and they said, "Is this the Gurvey residence?" Or something. And I said, "Yes." And they said, "We have to come in." I said, "On what grounds?" I said, "Why are you here?" They did not want to tell me. I said, "Can you tell me why you're here? Do you have a warrant? Why are you in my house?" And I said -- by the way, they said, "We're coming in. Come over here and get the door." To which I said, "Can I please -- there's a closet between me and you on my right side. I'd like to put a jacket on or a shirt to cover my towel." They said, "No. We're coming in. I walked towards the door to let them in and they virtually pushed me over. They broke the doors down. They really bashed in the metal of the screen door. They broke the handle. They box cut all the screen doors and they broke the lock on the wood outside of the oak door of the house and ran up the stairs. Okay?

(Deposition of Amy Gurvey, pp. 41-42 (DE 33-6 Ex. 5)). The Incident Report is consistent with Ms. Gurvey's account of what she was wearing upon the Officers' arrival, *i.e.,* that she "was standing in the rear of the hallway, in a towel by the kitchen." (DE 32-4, Ex. E; DE 33-6, Ex. 3.)

Officers were fully uniformed, their weapons remained holstered and they never displayed or threatened Gurvey with them. (Def. SOMF ¶20.)

Gurvey attempted to deescalate the situation and told the Officers that he was not a threat. (Def. SOMF ¶24.) Further, he stated that he had no weapons and was unarmed, that there was no danger, that he was "not suicidal," and that he was "not going to hurt [him]self or anybody else." (DE 32-4, Ex. C, Deposition of Plaintiff Harold Gurvey, T66:25-67:04.) Gurvey also demanded to know who made the call to the Police Department. (Def. SOMF ¶24.) The conversation lasted approximately fifteen minutes. (Def. SOMF ¶25.) Lieutenant Romito was of the opinion that Gurvey needed to have a psychological evaluation, based on Dr. Marino's initial phone call to the Police Department and the Officers' observation of Gurvey's behavior. (Def. SOMF ¶26; Def. Opp at 20.) Accordingly, the Police Department called an ambulance to Gurvey's home. (Pl. SOMF ¶ 17.)

The Officers told Gurvey that he could either go to the state psychiatric facility or to Mountainside Hospital for psychiatric examination. (Def. SOMF ¶27.) Gurvey opted for Mountainside Hospital. (Def. SOMF ¶29.) During the encounter, the Officers never threatened, touched, or handcuffed Gurvey, or placed Gurvey in a police squad car. (Def. SOMF ¶28.) The Officers did, however, require that Gurvey be transported to Mountainside Hospital by ambulance for his psychiatric examination. (Pl. SOMF ¶ 18.)

Although the Officers escorted Gurvey to the ambulance, they did not ride with him to Mountainside Hospital. (Def. SOMF ¶31; Pl. SOMF ¶ 19.) Gurvey was evaluated at the hospital for a few hours and then discharged. (Def. SOMF ¶33.) None of the Officers remained at Mountainside Hospital or met Gurvey upon his discharge. (Pl. SOMF ¶20.)

The Police Department filed an incident report on the same day as the incident, August 31, 2018 (the "Incident Report"). (DE 32-4, Ex. E; DE 35-6, Ex. 3.) The Incident Report was authored by Officer Lumpkin and reviewed by Captain Dul and Lieutenant Romito. (DE 32-4, Ex. E; DE 35-6, Ex. 3.) The Incident Report stated, among other things, that "[i]t should be noted that Mr.

Gurvey has a history of psychological problems." (Def. SOMF ¶40; DE 32-4, Ex. E; DE 35-6, Ex. 3.)

Gurvey and his wife filed separate internal affairs complaints stemming from their encounter with the Officers. (Def. SOMF ¶¶ 36-37.) The Police Department's Office of Professional Standards conducted an investigation that exonerated the Officers. (Def. SOMF ¶¶ 36-37; Pl. SOMF ¶24.) Further, the Essex County Prosecutor's Office investigated Mr. and Ms. Gurvey's claims and similarly exonerated the Officers. (Def. SOMF ¶¶ 38-39.)

### B. Procedural History

Gurvey filed his complaint on August 30, 2019 against Montclair, the Police Department, and the Officers. This *pro se* Complaint appears to be bringing the following claims:

- Pursuant to Section 1983: (1) unreasonable search and seizure; (2) *Monell* liability against Montclair; and (3) conspiracy to violate Gurvey's Fourth Amendment rights.[6]

- Pursuant to New Jersey state tort law: (1) defamation;[7] (2) false arrest; and (3) false imprisonment.

---

[6]    Although the Complaint asserts that Montclair is liable on a failure to supervise and train theory, Gurvey's cross-motion appears to argue that the alleged constitutional violation stemmed from an official municipal policy or an unofficial custom. Defendants, in moving for summary judgment, focus solely on the "policy, practice or custom" prong. Def. MSJ at 26. I do as well.

[7]    The Complaint cites 28 U.S.C. § 4101, which is a provision of the Securing the Protection of our Enduring and Established Constitutional Heritage Act ("SPEECH Act"), 28 U.S.C. §§ 4101 *et seq*, which was enacted "to prohibit recognition and enforcement of foreign defamation judgments and certain foreign judgments against the providers of interactive computer services." Securing the Protection of our Enduring and Established Constitutional Heritage Act, Pub. L. No. 111-223, 124 Stat. 2380. While the statutory provision cited by Gurvey provides a definition of defamation, "[d]efamation is not a federal statutory cause of action." *Rovetto v. Dublirer*, No. 20CV2497JMVMF, 2020 WL 7022667, at *9 (D.N.J. Nov. 30, 2020) (citing *Kaul v. Christie*, No. 16-2364, 2017 WL 2953680, *20 (D.N.J. June 30, 2017).

Gurvey's briefing implies that he intended to assert a New Jersey common-law defamation claim. Considering Gurvey's *pro se* status, and noting that Defendants themselves have treated Gurvey's defamation claim as one under New Jersey common law, I will construe the claim as a state law defamation claim.

- Pursuant to New Jersey criminal law: (1) obstruction of justice; (2) false reporting; and (3) tampering with public records.

(*See* Compl. ¶¶ 1, 15.)

The Defendants filed their answer on October 10, 2019. (DE 4.) The parties then conducted fact discovery.

Defendants' have filed a motion for summary judgment and motion to bar Plaintiff's expert reports and testimony. (DE 32-1) Gurvey cross-moves for summary judgment against the Defendants. (DE 33-2) The motions are fully briefed and ripe for decision.

## II.    LEGAL STANDARD — MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court deciding a motion for summary judgment must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof … the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met this threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact

for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III.   DISCUSSION

### A. Section 1983 Claim (Count 1)

Gurvey asserts claims under Section 1983,[8] including unreasonable search and seizure, civil conspiracy, and a *Monell* claim against Montclair. Both Gurvey and the Defendants move for summary judgment on all Section 1983 claims. I grant in part and deny in part the Defendants' motion, and deny Gurvey's motion.

### 1. Fourth Amendment

Gurvey alleges that the Officers' entry into his home "without a warrant, probable cause, reasonable investigation or exigent circumstances" violated his Fourth Amendment protection against unreasonable searches and seizures. (Compl. ¶ 89.) Defendants contend that the Officers' warrantless entry did not violate the Constitution because there were exigent circumstances, and that, assuming *arguendo* that there was a constitutional violation, the Officers are nevertheless entitled to qualified immunity. (Def. MSJ at 11-12, 26-29; Def. Opp. at 2-8; 17-18.) The key issue, sometimes obscured, is whether the officers, when at the door of the house, had reason to believe there was a danger so imminent that they could not apply for a warrant, even by telephone. I find that there are factual disputes barring summary judgment for either side.

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). That two-part analysis inquires as to

---

[8]   42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ....

(1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679. Even if there are fact questions as to the first, constitutional-violation prong, the district courts have been directed to decide the second prong, *i.e.,* whether the right was clearly established. *See Spady v. Bethlehem Area Ch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established.") Because this is Defendants' motion for summary judgment, the court considers the facts in the light most favorable to Gurvey. *Couden v. Duff*, 446 F.3d 483, 492 (3d Cir. 2006).

### i.   *Constitutional Violation*

The first prong of the qualified immunity analysis asks whether a constitutional violation occurred. Gurvey asserts that the Officers' warrantless entry into his home violated the Fourth Amendment. Defendants argue that exigent circumstances necessitated the Officers' warrantless entry. (Def. MSJ at 11.)[9]

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures inside someone's home … are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify

---

[9]     Gurvey cites the Supreme Court's recent decisions in *Caniglia v. Strom*, 141 S. Ct. 1596 (2021) and *Lange v. California,* 141 S. Ct. 2011 (2021), which do not directly bear on the present controversy. In *Caniglia*, the Supreme Court held that law enforcement's community caretaking duties do not justify warrantless searches and seizure in the home, but did not consider the exigent circumstances exception. *Caniglia,* 141 at 1599-1600. *Lange* held that under the Fourth Amendment, the pursuit of a fleeing misdemeanor suspect does not categorically justify a warrantless entry into the home, but requires a case-by-case assessment of the exigency. *Lange v. California*, 141 S. Ct. 2011, 2024 (2021). Nevertheless, this Court is guided by those decisions to the extent they bear on the contours of the exigent circumstances exception and the scope of the Fourth Amendment generally.

the intrusion." *United States v. Coles,* 437 F.3d 361, 365-66 (3d Cir. 2006)
(citing *Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New York*,
445 U.S. 573, 586 (1980)).

For warrantless search to be found constitutional, "there must be
probable cause and such other circumstances [as] would cause a reasonable
person to believe that the exigencies of the situation made that course
imperative." *United States v. Wolfe*, 452 F. App'x 180, 183 (3d Cir. 2011)
(citations omitted). Under the Fourth Amendment, an action is reasonable "as
long as the circumstances, viewed *objectively*, justify [the] action." *Quinn v.
Cintron*, 629 F. App'x 397, 399 (3d Cir. 2015) (emphasis added) (citing
*Devenpeck v. Alford,* 543 U.S. 146, 153 (2004) (internal quotation marks
omitted). The government bears the burden of demonstrating that exigent
circumstances justified a warrantless search, and that burden is 'heavy.'"
*United States v. Mallory*, 765 F.3d 373, 384 (3d Cir. 2014).

Interpreting the facts, discussed below, in the light most favorable to
Gurvey, such an entry could be objectively unreasonable, making summary
judgment in Defendants' favor inappropriate. *See Bodine v. Warwick*, 72 F.3d
393, 399 (3d Cir. 1995); *Fairclough v. Joyce*, No. CIV. 11-6222 FSH, 2015 WL
733388, at *1 n.3 (D.N.J. Feb. 20, 2015). Cases in this district ruling on
summary judgment motions have required that the exigent circumstances
warrant exception require (1) an *actual* indication of (2) *imminent* danger.

For example, in *Estate of Vargas v. County of Hudson*, 2020 WL 3481774
(D.N.J. June 26, 2020), Judge Vazquez denied defendants' motion for summary
judgment as to the plaintiff's Section 1983 and New Jersey Civil Rights Act
("NJCRA") claim, finding that a reasonable jury could conclude that exigent
circumstances did not exist. In that case, officers of the Bayonne Police
Department ("BPD"), in the course of conducting a welfare check, shot and
killed Mariano Vargas, who suffered from a schizoaffective disorder. *Id.* at 1.
The executor of the Vargas's estate brought Section 1983, NJCRA, and other
common-law tort claims against Bayonne and officers of the BPD. District

Judge Vazquez found that a reasonable jury could conclude that exigent circumstances did not exist, even where (1) a defendant police officer called BPD to request a welfare check on Vargas; (2) the officer informed BPD that Vargas "may not have been taking his medication and needed to go to the hospital" and "could become violent when he was not taking his medications"; and (3) another officer dispatched to Vargas's home was independently aware of Vargas's mental illness from a prior incident in which the officer was injured. *Id.* at *7. Judge Vazquez reasoned that while "*possibilities* were suggested" that Vargas stopped taking his medication and could become violent, "there was no indication that [Vargas] had *in fact* stopped taking his medication or was *in fact* violent." *Id.* at 7 (emphasis added). Moreover, because the "BPD officers did not observe any behavior indicating that [Vargas] was a threat to himself or others," a reasonable jury could conclude that exigent circumstances were not present due the "lack of any indication of imminent danger when the BPD officers" performed a forced entry into Vargas's residence. *Id.*[10]

Similarly, in *Fairclough v. Joyce*, No. CIV. 11-6222 FSH, 2015 WL 733388, at *1 n.3 (D.N.J. Feb. 20, 2015), Judge Hochberg denied the parties' cross-motions for summary judgment. She found that there were disputed factual issues as to both the existence of exigent circumstances and the objective reasonableness of the officers' warrantless entry into the plaintiff's home. Judge Hochberg acknowledged certain facts that could lead to an objectively reasonable belief that the plaintiff would imminently harm himself: (1) the plaintiff's father called 911 asserting that plaintiff was going use a handgun to kill himself; (2) the defendant police officer telephoned the plaintiff's father to confirm the 911 call and found the father "to be credible and sober"; (3) at least two guns were registered in plaintiff's name; and (4) the on-scene officer witnessed the plaintiff "repeatedly and profanely yelling at the officers on scene, to his wife, and to police personnel over the telephone," while refusing to cooperate with the on-scene police officer. *Id.* Judge Hochberg,

---

[10]     Impliedly, of course, a reasonable jury could also conclude the contrary.

however, noted plaintiffs' citation of facts to the contrary: (1) they disputed the police officers' testimony of plaintiff's profane shouting and arguing with the officers and plaintiff's wife; (2) they disputed that the defendant police officer telephoned plaintiff's father to confirm the 911 call; (3) they claimed that none of the on-scene officers "reported seeing a gun in Plaintiff's hands"; and (4) they asserted that a defendant police officer spoke with plaintiff and plaintiff's wife several times, between the 911 call and the officer's forced entry, and told other on-scene officers "that Plaintiff was 'not going to kill himself.'" *Id.* Therefore, Judge Hochberg found that the disputed factual issues were material to a finding of probable cause to enter the plaintiff's home, precluding summary judgment. *Id.*

By contrast, in *Estate of Del Rosario v. Paterson Police Dep't*, No. 14-CV-5167, 2020 WL 373354 (D.N.J. Jan. 23, 2020), Judge Martini found that the undisputed facts established that the defendant officer's warrantless entry into the bedroom of Saulo Del Rosario ("Rosario") was objectively reasonable based on exigent circumstances. *Id.* at 4. There, the Paterson Police Department was dispatched to Rosario's home on "'a call of a barricaded Emotionally Disturbed Person' ("EDP")." Rosario, who had a history of seizures and mental disturbances, was killed during an altercation with the police. *Id.* at *1, *4. In finding that it was objectively reasonable for the defendant officer to enter Rosario's bedroom without a warrant,[11] Judge Martini noted that it was undisputed that (1) the officer was informed that Del Rosario was "an EDP and not responding"; (2) the officer witnessed other on-scene officers' "failed attempts to communicate with [Del Rosario]"; (3) the officer learned from another on-scene officer that Del Rosario "had broken some glass and shrieked or yelled inside the room"; and (4) the officer was informed by Del Rosario's

---

[11]     The defendant officers entered Del Rosario's residence with the consent of Del Rosario's children, who described Del Rosario's medical condition to the responding officers and requested the officers' assistance in opening Del Rosario's bedroom. *Id.* at 1. Judge Martini found, however, that "further consent (or some other justification) was required to enter the bedroom due to [Del Rosario's] obvious resistance to the officers' entry." *Id.* at 3.

family "that he had a history of epilepsy, had not taken his medication, was mentally ill, and that they had been unable to communicate with him since 3:00 AM." *Id.* at 4. These facts—known by the defendant officer before ordering the breach of the bedroom door—established probable cause for the officer to believe that Del Rosario was in imminent danger. *Id.*

I apply the principles of those cases to the relevant disputed and undisputed facts. First, common ground: The parties agree that Ms. Gurvey spoke to Dr. Marino on the telephone on the subject of her husband; that Dr. Marino called the Montclair police; that Police Department dispatch requested that the Officers perform a wellness check on Gurvey, informing them that he was suicidal and a potential harm to others; and that the Officers entered the Gurvey home forcibly and without a warrant.  Many of the relevant subsidiary facts, however, are disputed.

I begin with the call to Dr. Marino. According to Ms. Gurvey, she explained to Dr. Marino that Mr. Gurvey was going to the Geriatric Clinic to "see someone for an emergent problem with his foot." She told Dr. Marino that she had called the same Geriatric Clinic "several months ago" to get Mr. Gurvey cleared to be a part of the clinic's research grant for people who "had been given early retirement," and was inquiring as to whether he had been approved for the program and "whether they had assigned anyone to him." That, Ms. Gurvey testified, was the extent of her conversation with Dr. Marino. (DE 33-6, Ex. 5 at T34:24-36:19.)

Dr. Marino's recollection differed. She testified that, in that telephone call, (1) Ms. Gurvey called her requesting help for her husband, and sounded distressed and erratic; (2) Ms. Gurvey said that if she called 911, as Dr. Marino advised, "then her husband would shoot somebody"; and (3) that Ms. Gurvey told her "that her husband was going to kill himself." (Def. SOMF ¶¶ 5-9.)

Dr. Marino testified that she then phoned the Montclair police, related the substance of the call with Ms. Gurvey, and requested a wellness check. Based on Marino's account, police dispatch sent the Officers to the Gurvey home.

14

What happened at the front door of the Gurvey home is subject to dispute. Gurvey maintains that the Officers "were met at the front door by [his] wife … who asked them to wait while she put on a shirt." (Pl. SOMF ¶12.) Indeed, the Supplemental Investigation Report reflects that Ms. Gurvey requested that the police report reflect that: (1) the Officers "never advised her of the reasons they needed to enter her residence and see her husband": and (2) Ms. Gurvey told the Officers "that she wished [to] get properly dressed." (DE 32-4, Ex. E.) On the other hand, Defendants assert that the Officers "encountered a locked screen door" and that Ms. Gurvey refused outright to open the door and told the officers to go away. (Def. SOMF ¶14.)[12] Not knowing what was going on in the house, and mindful of the police dispatch based on Dr. Marino's account of her telephone call with Ms. Gurvey, the Officers entered the front door forcibly, without a warrant.

The question becomes whether, for summary judgment purposes, the disputes about the facts are "material" to the issue of whether there were exigent circumstances justifying the warrantless entry to the Gurvey home.

According to Ms. Gurvey, her call to Dr. Marino was merely a request for an appointment. Even in Marino's account, the threat of violence was expressed in terms of Mr. Gurvey's likely reaction to a 911 summons to the police, which of course is exactly the course that Marino pursued. Dr. Marino did not represent that she physically observed or spoke to Mr. Gurvey, and there is no indication that the Officers telephoned Ms. Gurvey for confirmation. More fundamentally, a fact finder, if it accepted Ms. Gurvey's benign version of her telephone call with Dr. Marino, could doubt Marino's account of what she told the police, or could believe that the police misinterpreted Marino.

---

[12] This particular factual clash has its anomalous aspects. Ms. Gurvey, who claims a violation of Fourth Amendment rights, could be interpreted as saying that she merely asked the Officers to wait while she donned her shirt, but that they impatiently entered right away. The Officers, who deny any such Fourth Amendment violation, insist that Ms. Gurvey adamantly refused to admit them, so they broke in anyway.

Now the police, it is true, may permissibly investigate based on an account that later turns out to be inaccurate, and they knew of no reason that Marino would want to misrepresent the facts. Nor did the police violate any Fourth Amendment right by following what they took to be the prudent course and knocking on the door of the home. Presumably in a majority of cases, the homeowner would simply admit the police or otherwise confirm or deny the emergency. But the homeowner is not obligated to do so, and where entry is denied, the police must ordinarily obtain a warrant.

What the police found at the home, on either side's version of the facts, did not corroborate that there was an imminent threat. At the front door, they were met by Ms. Gurvey—the very person who supposedly had expressed the concerns leading to the police welfare check. She indicated that there was no reason for the police to come in, and refused them entry. Far from being found in the midst of some violent or dangerous situation, she was wrapped in a towel as if dressing or emerging from the bath. There was no shouting or any other indication of violent or even angry behavior.

The police argue, with some force, that they could not see what was going on inside the house, and had reason for concern. Still, the issue is not whether the police should have dropped the matter. The issue is whether the facts at that point established that there was a threat so imminent that the police could not take the time to apply for a warrant, in person or orally by telephone. *See* N.J. Ct. R. 3:5-3(b) (telephonic warrant); *State v. Johnson*, 193 N.J. 528, 555–56 (N.J. 2008).

I reiterate that under their own version of the facts, which a jury could also accept, the actions of the police may appear more reasonable. However, whether that "'now or never situation' actually exists"—necessitating a warrantless search of the home—depends on the unique facts on the ground. *Lange*, 141 S. Ct. at 2018. On the current record, those facts are subject to dispute and accordingly, a reasonable jury could find that a constitutional violation did—or did not—occur when the officers entered Gurvey's home

16

without pausing to obtain a warrant.[13] On that issue, both sides' summary judgment motions must be denied.

###### ii.   Qualified Immunity

The second prong of the qualified immunity analysis asks whether the constitutional rule which was allegedly violated was "clearly established" at the time of Officers' conduct. The "clearly established" prong of the qualified immunity analysis "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The inquiry is "an 'objective (albeit fact-specific) question,' under which '[an officers'] subjective beliefs are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

While a case precisely on point is not required, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 217 F.3d 566, 572 (3d Cir. 2001). "Such precedent must either come either from the Supreme Court or a 'robust consensus of cases of persuasive authority in the Court of Appeals.'" *In Re: J & S Properties, LLC*, No.

---

[13]   While Defendants rely on *Catlett v. New Jersey State Police*, 2015 WL 9272877 at *3 (D.N.J. Dec. 18, 2016), for the proposition that exigent circumstances can exist "from a single report or call to a police officer," Def. Reply at 5, that case is distinguishable from this one. In *Catlett*, although law enforcement was dispatched to plaintiff's home due to reports of the plaintiff being suicidal, the undisputed material facts also establish that the plaintiff's mother consented to the officer's entry after the officer explained "that he was responding to a report that Catlett was suicidal," as well as the plaintiff's mother informing the officer after entry that the plaintiff was indeed depressed. *Catlett*, 2015 WL 927877 at *1. If Plaintiff's statement of the facts is to be believed, the Officers did not listen to Ms. Gurvey's version or afford her the opportunity to grant or withhold consent to their entry.

16-3366, 2017 WL 4294065, at *4 (3d Cir. Sept. 28, 2017) (quoting *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016).

In determining whether a constitutional right has been clearly established, the Court must "define the right allegedly violated at the appropriate level of specificity." *Sharp*, 669 F.3d 144, 159 (3d Cir. 2012) (citation omitted). Both the Supreme Court and the Third Circuit have instructed courts "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant sense, in light of the case's specific context, not as a broad general proposition.'" *Estep v. Mackey*, 639 F. App'x 870, 873 (3d Cir. 2016) (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)).

The home, of course, enjoys the highest level of Fourth Amendment protection against warrantless searches, as any officer would know. *See Groh v. Ramirez*, 540 U.S. 551, 559, 124 S. Ct. 1284 (2004); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). More specifically, however, there are exceptions to the warrant requirement, and one of those exceptions applies where exigent circumstances make obtaining a warrant impracticable. And one such exigency is imminent injury to an individual within the home:

> One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. " The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " …. Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403–04, 126 S. Ct. 1943, 1947 (2006) (case law citations omitted). As noted above, the officers effecting a warrantless entry must "reasonably … believe that someone is in *imminent*

18

*danger.*" *Parkhurst*, 77 F.3d at 711 (emphasis added). Those principles, at an appropriate level of specificity, are clear and well established.

Defendants assert that "facts in the record support the officer's reasonable belief that exigent circumstances existed to enter the home," including evidence that: (1) dispatch informed the Officers that Gurvey was suicidal and a potential harm to others; and (2) the Officers' inability to observe Gurvey's status from outside his home. (Def. MSJ at 27-28.) Based on the record, however, there remain disputes of fact as to whether the Officers actually witnessed anything that suggested it was necessary to break in before a warrant could be obtained. Instead, the evidence suggests that only the request for a wellness check and the fact that "[Gurvey's front] door was not yet open," provided the Officers with what they believed to be sufficient justification to enter Gurvey's home. (DSOMF ¶ 17.)[14]

In addition, the Defendants do not offer any evidence as to how long it would have taken to obtain a warrant. In New Jersey, an oral warrant may be obtained by telephone if the situation is exigent. *See* N.J. Ct. R. 3:5-3(b); *State v. Johnson*, 193 N.J. 528, 555–56, 940 A.2d 1185, 1200 (2008). There is no indication in the record that this alternative was tried, or that it could not have been tried.

On at least one version of the facts, there was no sufficient indication of imminent danger precluding an application for a warrant. It should have been

---

[14]     Although the Incident Report states that the Officers informed Ms. Gurvey of the reason for the wellness check and that Ms. Gurvey "appeared to be highly agitated and refused to open the front door," Ms. Gurvey's deposition testimony contradicts this. Ms. Gurvey testified that: (1) the Officers "did not explain to [her] why they were there when they came to the door"; (2) the Officers informed her that they "had to come in," to which Ms. Gurvey asked the Officers why they were there and whether they had a warrant; and (3) in response to Ms. Gurvey asking the Officers to wait while she "put a jacket on or a shirt to cover [her] towel," the Officers refused, stated they "[w]e're coming in," and proceeded to break the doors down. DE 33-6 Ex. 5, Deposition of Amy Gurvey, 41:06-44:06. The Court, it need hardly be said, is wary of bootstrapping a finding of exigent circumstances based on the homeowner's refusal to consent to entry.

clear to a reasonable officer that the forced entry that occurred could not have been legally justified.

It is possible, even likely, that the Officers acted here from the best of motives. Nevertheless, good motives are not sufficient, and facts material to the merits of the claim and to qualified immunity remain disputed. Therefore, both the Defendants' and Gurvey's summary judgment motions are denied as to the unreasonable search and seizure claim.

### 2. Civil Conspiracy

Count 1 and Count 4 allege a conspiracy under 42 U.S.C. § 1985.[15] Section 1985 is a federal statute providing civil remedies for a conspiracy which deprives a person of civil rights. Gurvey does not specify whether he is raising his conspiracy claim under 42 U.S.C. § 1985(2) or (3).

Section 1985(2) prohibits conspiracies to obstruct justice with the intent to deny equal protection of the laws. A claim under § 1985(3) requires Gurvey to demonstrate: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to equal protection of the laws; (3) an act of furtherance of the conspiracy; and (4) injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Mosca v. Cole*, 384 F. Supp. 2d 757, 769 (D.N.J. 2005), *aff'd*, 217 F. App'x 158 (3d Cir. 2007) (citing *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997). Both subsections, however, require that Gurvey allege a race or class-based motive for the Defendants' alleged actions. *See Davis v. Twp. of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999); *Jenkins v. Orange Police Dep't*, No. CIV. 2:11-1555 KM, 2014 WL 4896383, at

---

[15]    Count 1 of the Complaint does not include any factual allegations concerning Gurvey's Section 1985 conspiracy claim. On the other hand, Count 4 asserts that the Incident Report, authored by Officer Lumpkin, and reviewed by Lieutenant Romito and Captain Dul, contains "demonstrably false entries" and omits "relevant facts documenting actions by defendant officers." Accordingly, Gurvey claims that the Defendants conspired to "cover-up [their] violations of [Gurvey's] Fourteenth Amendment rights" in violation of 42 U.S.C. § 1985. (Compl. ¶ 102.)

*13 (D.N.J. Sept. 29, 2014); *cf. Limehouse v. Delaware*, 144 F. App'x 921, 923 (3d Cir. 2005).

Gurvey has not identified any facts from which a reasonable jury could conclude that the Officers acted out of animus toward any protected class of which he is a member. Indeed, Gurvey has not even alleged that he is a member of such a protected class. Summary judgment is therefore granted in favor of Defendants with respect to any Section 1985 conspiracy claim contained in Counts 1 and 4.

### 3. *Monell* Claims Against Montclair

Finally, Gurvey asserts that there is municipal liability for his constitutional § 1983 claims. For constitutional torts, municipalities and local governments cannot be held liable on a *respondeat superior* theory. Municipal liability for the acts of employees must be premised on the doctrine of *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978). *See Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 237 (3d Cir. 2013). The "official policy" requirement in *Monell* "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible"—acts, in other words, which municipality "has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) (emphasis in original).

To establish a prima facie case for *Monell* liability, Gurvey must "(i) demonstrate the existence of an unlawful policy or custom; (ii) that resulted in a deprivation of the rights, privileges, or immunities secured by the Constitution or laws of the United States; and (iii) that the policy or custom was the proximate cause of the alleged deprivation." *Maldonado v. City of Passaic Bd. Of Educ.*, No. CV1712245ESJAD, 2020 WL 289649, at *7 (D.N.J. Jan. 21, 2020) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A government policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official

proclamation, policy, or edict." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Bielevicz*, 915 F.2d 845, 850 (3d Cir. 1990)). In contrast, "a course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Id.*

Gurvey argues that Montclair has delegated policymaking powers to Police Chief Todd M. Conforti, who in turn has delegated authority "to his supervisors, including Captain Emil Dul, Captain Scott Buehler, and Lieutenant Robert Romito, who have created 'longstanding practices so persistent and widespread as to fairly represent government policy or the force of law.'" (Pl. MSJ at 26) (citing *Harris Cty. v. Coats*, 607 S.W.3d 359 (Tex. App. 2020), *reconsideration en banc denied*, No. 14-17-00732-CV, 2021 WL 524944 (Tex. App. Feb. 11, 2021)).

Defendants contend that the *Monell* claim must fail because Gurvey has not identified "a specific policy, practice or custom that has been adopted and/or implemented by an official policy-maker" of Montclair, and has not established that Montclair's conduct was "the moving force behind" his injuries. (Def. MSJ at 26.) The Court agrees that Gurvey has not documented an official municipal policy, such as a proclamation, policy, or edict that caused his injuries.

An alternative route to *Monell* liability, as noted, is a *de facto* policy or practice. Gurvey identifies such practices as follows:

- Not taking steps to verify the identify of callers requesting police action so as to avoid "swatting" and other illegal actions.

- Not differentiating between calls to the "non-emergency" number ... and calls to the 9-1-1 system in radio communications, written reports and common discussion creating a dangerous environment in which escalation occurs [and] encourages overreaction.

- Allowing numerous units to "pile on" in addition to units dispatched to a location unnecessarily and dangerously escalating the situation.

- Failure to properly edit official reports to ensure that proper attribution is attached to any statement of alleged "fact" which has not been determined to be true after due diligence and investigation.

- Failure to furnish filers of citizen complaints with responses to their concerns sufficient to ensure that all points raised have been investigated properly.

- Failure to supply field units with body warn camera to document transactional events between members of the police force and members of the public, resulting in ambiguities in subsequent reporting and testimony.

(Pl. MSJ at 26-27.)

Most or all of the listed practices, however, appear to bear little or no relation to the constitutional tort that is alleged. The caller (Dr. Marino) was not misidentified and was not a "swatter"; there is no indication that anyone overreacted to a call because it was placed to a 911 number; although Plaintiff disagrees with certain facts in the police reports, the reports appear to accurately reflect the officers' version of what occurred; the incident is not causally linked to any systematic failure to respond to citizen complaints; and while body cameras often are useful in documenting interactions, their lack is not a "policy" that is closely connected to the occurrence of this alleged violation.

While Gurvey takes issue with the practices of the police during *this* incident, Gurvey does not provide factual support for the proposition that this incident was expressive of some more general policy. And finally, Gurvey fails to cite any other comparable situations or incidents in which the alleged practices resulted in injuries to other individuals.

For the reasons stated above, I find that no reasonable jury could find for Gurvey on his policy or custom theory. I therefore grant Defendants' summary judgment motion and dismiss Gurvey's *Monell* claim against Montclair.

## B. State Law Tort Claims

As stated above, it appears that Mr. Gurvey intends to assert state-law claims against the Officers for the torts of defamation, false arrest, and false imprisonment.

### 1. Defamation

#### a. Notice of a defamation claim under the NJTCA

Under the New Jersey Tort Claims Act ("NJTCA"), a plaintiff in a tort action against a public entity or public employee must provide notice of his claim no later than ninety days after the claim has accrued. N.J. Stat. Ann. § 59:9-8 ("A claim relating to a cause of action for ... injury or damage to person or to property shall be presented ... not later than the 90th day after accrual of the cause of action.") This notice requirement applies to all common law tort actions, including actions for defamation. *See Velez v. City of Jersey City*, 180 N.J. 284, 296 (N.J. 2004) (finding "no justification" for the notion that NJTCA's notice requirement did not apply to all "common law tort claims" against public employees liable under the Act); *May v. Borough of Pine Hill*, 755 F. Supp. 2d 623, 630 (D.N.J. 2010) (dismissing defamation claim for failure to comply with NJTCA's notice requirement). Where a plaintiff fails to provide such notice, the suit will be dismissed. *See Lassoff v. New Jersey*, 414 F. Supp. 2d 483, 489 (D.N.J. 2006).

Indeed, "notice to the public entity is a necessary condition precedent to file a complaint against the public entity. *Doe v. Bd. of Educ. of Vocational-Tech. Sch. Dist. in Cty. of Gloucester*, No. CV 17-13793 (RBK/JS), 2019 WL 2183860, at *3 (D.N.J. May 21, 2019) (citing *Beauchamp v. Amedio*, 751 A.2d 1047, 1053 (N.J. 2000)). Specifically, § 59:8-4 requires that the notice of claim include the "date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;" and "[a] a general description of the injury damage or loss incurred." N.J. Stat. Ann. § 59:8-4. The NJTCA's requirements are designed to "allow the public entity time to review the claim and to promptly investigate the facts and prepare a defense while the incident is fresh; provide the entity with an opportunity to settle meritorious claims before a

lawsuit is filed; afford them an opportunity to correct the conditions which give rise to the claim"; and "inform the State in advance as to the indebtedness or liability that it may be expected to meet." *Velez*, 850 at 1242 (N.J. 2004) (quoting *Beauchamp*, 751 A.2d at 1053).

Here, Defendants are all public entities or public employees within the meaning of the NJTCA. Gurvey's notice of claim lists "[b]reaking and entering, assault, false arrest, [and] kidnapping" as the wrongful acts committed by the Defendants. (DE 33-8, Ex. 10, Gurvey Notice of Claim.) The notice of claim, however, fails to (1) cite a potential defamation claim against the Defendants; (2) cite the Incident Report's allegedly defamatory statement that "Mr. Gurvey has a history of psychological problems"; or (3) make any reference to the Incident Report at all. (DE 33-8, Ex. 10.)

Gurvey has not provided Defendants sufficient notice of his defamation claim pursuant to the NJTCA. Nor is a defamation claim so closely akin to, *e.g.*, "breaking and entering," that the Defendants should have gleaned such a claim by implication.

Nor does the equitable doctrine of substantial compliance save the claim, though this is a closer question. Under New Jersey law, the equitable doctrine of substantial compliance prevents the barring of legitimate claims due to technical defects. *Meale v. City of Egg Harbor City*, No. CIV. 14-5860 RMB/JS, 2015 WL 3866222, at *4 (D.N.J. June 23, 2015) (citations omitted). In that connection, Gurvey points to his November 14, 2018 Citizen's Complaint to the Montclair Police Department's Office of Professional Standards, in which he referred to the Incident Report's statement that "Mr. Gurvey has a history of psychological problems." (DE 33-6, Ex. 7, Gurvey Citizen Complaint).

At least one court in this district has held that the filing of an internal affairs complaint does not constitute sufficient notice for purposes of the NJTCA. In *Platt v. Gonzalez*, No. 09-6136, 2011 WL 2413264, at *3-4 (D.N.J. June 9, 2011), the plaintiff asserted that he substantially complied with the NJTCA by filing both an "Internal Affairs Complaint with the Atlantic City

Police Department" and two "Civilian Complaint Requests" with the Atlantic City Municipal Court, seeking to charge police officers with various torts. *Platt* held that the "Internal Affairs Complaint"—filed with the police department— "could not be considered notice pursuant to the [NJ]TCA." *Id.* Moreover, I note that Mr. Gurvey's Citizen's Complaint does not (1) explicitly name the Montclair Police Department or the Officers (2) provide an amount of civil damages claimed, or (3) list tort claims that Gurvey intended to bring against the Defendants. All three are requirements of a notice of claim. *See generally Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 296 (D.N.J. 2012)

    The Defendants have therefore been deprived of the notice to which they were entitled under New Jersey law. Summary judgment will be granted to the Defendants, and the defamation claim will be dismissed on this basis.

### b. Defamation (Count 3)

    For the removal of doubt, however, I also consider the merits of the defamation claim, and find them lacking.

    Gurvey alleges defamation in that the Incident Report contains a false statement of fact that was "made without attribution or sourcing, imparting to it the 'seal of approval' of the Montclair Police." (Pl. MSJ at 28. ) According to Gurvey, the evidence establishes that the Police Department failed "to verify the false claim," evincing the Defendants' reckless disregard for the truth. (Pl. MSJ at 28.) Gurvey also asserts that the Incident Report constitutes "defamation *per se*" for which damages are presumed. (Pl. MSJ at 28-29.)

    Defendants move for summary judgment, asserting that the Incident Report falls under an absolute privilege. (Def. MSJ at 20.) Moreover, Defendants argue that the Gurvey "has failed to establish an actual injury," citing Gurvey's admission in his deposition that "no injury resulted from [the] alleged defamation." (Def. MSJ. at 20-21.) Finally, Defendants assert that the record does not demonstrate that: (1) the Defendants knew that the allegedly defamatory statement "was false and that it defamed plaintiff"; or (2) that the

Defendants "acted with reckless disregard for the statement's truth or falsity as required to prove defamation." (Def. MSJ at 21.)

Under New Jersey law, to state a claim for defamation, Gurvey must establish that Defendants (1) made a false and defamatory statement concerning the plaintiff; (2) communicated the statement to a third party; and (3) had a sufficient degree of fault. *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011). Whether a statement is false and defamatory requires an analysis of "(1) the content, (2) verifiability, and (3) the context of the challenged statement." *Leang v. Jersey City Bd. Of Educ.*, 198 N.J. 557, 585 (N.J. 2009). Factual statements are those capable of verification, *i.e.*, subject to proof of truth or falsity in relation to external realities; pure opinion statements are not capable of such verification because they reflect only one's state of mind. *See Ward v. Zelikovsky*, 643 .2S 972, 979 (N.J. 1994). Statements that are substantially true are not defamatory. *Myers v. Atl. Health Sys.*, No. CV 13-4712, 2017 WL 253846, at *8 (D.N.J. Jan. 20, 2017) (citing *Taylor v. Amcor Flexibles Inc.*, 669 F. Supp. 2d 501, 513 (D.N.J. 2009). Where the victim is a private figure, defamation generally requires only a showing of negligence. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Costello v. Ocean Cnty. Observer*, 643 A.2d 1012, 1021 (N.J. 1994).[16]

### i.   *Police Department Incident Report*

The Incident Report, authored by Officer Lumpkin, and reviewed by Lieutenant Romito and Captain Dul, includes an allegedly false statement that, "It should be noticed that Mr. Gurvey has a history of psychological problems." (Compl. ¶94; DE 33-6, Ex. 3.)

The statement that "Mr. Gurvey has a history of psychological problems" is clearly susceptible of a defamatory meaning. Whether Gurvey has a history of "psychological problems" is a factual, falsifiable proposition. Gurvey submits

---

[16]     This is not to be confused with the higher threshold of actual malice that is required in relation to a public figure. *Id.* The existence of a qualified privilege, however, may raise the required mental state to actual malice, even with respect to a nonpublic figure. *See infra.*

in his motion for summary judgment that he "was *never* evaluated for psychological problems until January 12, 2021," when he was diagnosed with post-traumatic stress disorder triggered by the Police Department wellness check. (Pl. MSJ at 28.) Again, the Defendants have their own story to tell, in which Ms. Gurvey sought psychological help for her husband and stated that he would become violent if the police were to perform a wellness check, which would tend to indicate some sort of mental condition. This, however, is summary judgment, and I interpret the facts as Gurvey states them.

Nevertheless, Gurvey's defamation claim fails on grounds of qualified privilege.[17] "New Jersey courts 'have long recognized the existence of a qualified privilege that confers immunity upon a public official for defamation uttered in relation to matters committed by law to [his or her] control or supervision.'"[18] That immunity is lost only if "the defamation is made with actual malice in the *New York Times v. Sullivan* sense: 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Nurke v. Deiner*, 97 N.J. 465, 475 (1984) (internal citations omitted). Assuming *arguendo* that Gurvey satisfied the basic elements of a defamation claim, he has still failed to demonstrate a genuine issue of fact as to whether Officer Lumpkin authored the statement in the Incident Report with actual malice.

---

[17]  The statements are not, however, subject to the absolute privilege, which applies only to a statement must be made "in the course" of a judicial proceeding, and notably, does not "cover publications made before commencement of the judicial proceeding." *Dijkstra v. Westerink*, 168 N.J. Super. 128, 134, 135-36 (N.J. App. Div. 1979); *see also Frost v. Cty. of Monmouth*, No. 3:17-CV-4395-BRM-DEA, 2018 WL 1469055, at *5 (D.N.J. Mar. 26, 2018). The Incident Report was authored in connection with a wellness check, and Gurvey was never charged or subjected to any related judicial proceedings.

[18]  *Andros v. Gross*, No. CIV. 03-1775 (JBS), 2005 WL 3500058, at *9 n.19 (D.N.J. Dec. 21, 2005), *aff'd in part*, 294 Fed. App'x 731 (3d Cir. 2008) (citing *Brayshaw v. Gelber*, 232 N.J. Super 99, 112 (App. Div. 1989); *see also* N.J. Stat. Ann. § 59:3-10 ("A public employee acting in the scope of his employment is not liable for injury caused by his misrepresentation."); *cf. Hornberger v. Am. Broad. Companies, Inc.*, 351 N.J. Super. 577, 597, 799 A.2d 566, 578 (App. Div. 2002) (noting that police officers are public officials for purpose of actual malice requirement articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (citing *Costello v. Ocean Cty. Observer*, 136 *N.J.* 594, 613, 643 *A.*2d 1012 (1994)).

The actual malice standard applies here because the statement was made in connection with Officer Lumpkin's documentation of the wellness check, pursuant to his duty as a police officer. That surely is a matter "committed by law to [Lumpkin's] control or supervision." *Andros*, 2005 WL 3500058, at *9 n.19; N.J. Stat. Ann. § 59:3-10.

In his motion for summary judgment, Gurvey submits that: (1) the "statement was entered into the official record by the Montclair Police Department without any evidence to support its false claim"; and (2) there is no evidence "that the Montclair Police Department made any attempt to verify the false claim demonstrating a reckless disregard for the truth on the part of the Defendants." (Pl. MSJ at 28.) Gurvey also submits, citing his Citizens Complaint, that the "Defendants refused to correct or amend the language as requested." DE 33-6, Plfs. Mot. at 28 (citing DE 33-6, Ex. 7).

On this record, a reasonable jury could not find that Officer Lumpkin acted with actual malice in authoring the Incident Report. "Actual malice" exists when the defendant "has actual knowledge that the statement he is making is false, or when he entertains serious doubts as to its truth." *Pitts*, 337 N.J. Super at 339-40 (citing *Burke v. Deiner*, 97 N.J. 465, 469 (N.J. 1984); *see also Andros*, 2005 WL 3500058, at *9.

It is true that the parties disagree as to what passed between the officers and Ms. Gurvey. It is undisputed, however, that Officer Lumpkin was dispatched to Gurvey's home based on a mental health professional's telephoned report and request for a wellness check. (DE 32-4 Ex. D, E; Def. SOMF ¶1.) According to Dr. Marino, Ms. Gurvey "sounded distressed, erratic, and was calling to request help for her husband," who, Ms. Gurvey claimed, "was going to kill himself," and "would shoot somebody" if she called 911. (Def. SOMF ¶¶ 5-9.) This was no anonymous "swatting" call. No evidence is proffered to suggest that the police actually doubted, or had reason to doubt, the statements of Dr. Marino, who had no apparent motive to fabricate. Without (1) "actual knowledge" of the falsity of the at-issue statement or (2) "serious doubt" as to the statement's veracity, Gurvey is unable to overcome the qualified

privilege. Therefore, summary judgment is granted to Officer Lumpkin with respect to Gurvey's defamation claim.

The Court also grants summary judgment in favor of Montclair (acting through its Police Department) on the defamation claim. Under the NJTCA, a public entity is protected from liability for the "acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2-10. Because Officer Lumpkin, the author of the incident report, is an employee of the Montclair Police Department and therefore an employee of a public entity, the Township cannot be liable for Officer Lumpkin's alleged defamation—which is an intentional tort. *See D & D Assocs., Inc. v. Bd. of Educ. of N. Plainfield*, No. CIV.A. 03-1026MLC, 2007 WL 4554208, at *26 (D.N.J. Dec. 21, 2007), *aff'd*, 552 F. App'x 110 (3d Cir. 2014); *Russo v. Ryerson,* No. 01-CV-4458 JLL, 2006 WL 477006, at *33 (D.N.J. Feb. 28, 2006), *on reconsideration in part*, No. 01-CV-4458 (JLL), 2006 WL 8458057 (D.N.J. Apr. 17, 2006).

### C. False Arrest and False Imprisonment (Count 3)

In Count Three of his Complaint, Gurvey asserts a tort claim of false imprisonment. He alleges that he "was forcibly taken to Mountainside Hospital by defendants, who knowingly retained 'another unlawfully so as to interfere substantially with his liberty." (Compl. ¶¶ 99–100.)

Under New Jersey law, false arrest and false imprisonment "are different names for the same tort." *Price v. Phillips*, 218 A.2d 167, 169 (N.J. Super. Ct. App. Div. 1966). A plaintiff must establish "(1) an arrest or detention of the person against his will; (2) done without proper legal authority or 'legal justification.'" *Ramirez v. United States*, 998 F. Supp. 425, 434 (D.N.J. 1998). The quintessential "legal justification," of course, is probable cause to arrest, but there are others. *Id.*

N.J. Stat. Ann. § 30:4-27.6(a) permits a "law enforcement officer to take custody of a person and take that person immediately and directly to a screening service if, on the basis of a personal observation, the law

enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment to treatment." *Id.; see also Leenstra v. Then*, No. CIV.A. 10-5909 JLL, 2013 WL 663313, at *5 (D.N.J. Feb. 21, 2013). In this context, reasonable cause and probable cause appear to be interchangeable concepts: "[P]robable cause may exist if it is shown that defendants had reasonable cause to believe that plaintiff was in need of involuntary commitment to treatment." *Kleinberg v. Clements*, No. CIV.A. 09-4924 NLH, 2012 WL 1019290, at *7 (D.N.J. Mar. 23, 2012).

Defendants attempt to cut off such a claim at the threshold, contending that "there is nothing in the record to suggest that Plaintiff was formally arrested or restricted to a degree associated with a formal arrest." (Def. MSJ at 14.) I disagree. To begin with, Gurvey testified that he specifically asked Lieutenant Romito whether he was "under arrest," to which Romito allegedly replied in the affirmative. (DE 33-6, Ex. 7; DE 32-4, Ex. C, Deposition of Plaintiff Harold Gurvey, T71:15-16). Ms. Gurvey also testified in her deposition that she asked the officers if Plaintiff was under arrest to which they repeatedly: (1) answered "yes"; and (2) refused to answer why. (DE 33-6, Ex. 5, 49:01-06; 49:01-06, 49:13-20; 49:22-50:02; 52:10-15.) Of course, he was not accused of any crime. It is undisputed, however, that the police exercised their authority, forcibly entered the home, and compelled Gurvey to report for a psychiatric evaluation—either at the state facility or at Mountainside Hospital—against his wishes. (DE 2-4, Ex. C, T70:25-71:07; Def. SOMF ¶27.) That is enough to trigger the reasonable cause requirement.

Genuine issues of material fact preclude a determination of whether the Officers had reasonable cause to send Gurvey to Mountainside Hospital. (Def. MSJ at 16-17.)[19] First, because there are factual disputes relating to "the

---

[19]    Defendants mistakenly cite N.J. Stat. Ann. § 30:4-27.4 as the statutory authority empowering the Officers to require Gurvey to undergo a psychiatric evaluation. That particular section merely relates to the designation of mental health agencies or facilities as a "screening service" under New Jersey law. The correct statutory authority would be N.J. Stat. Ann. § 30:4-27.6, which empowers a law

events leading to the warrantless entry which would weigh upon the reasonableness of defendants' belief" that Gurvey needed involuntary screening, the issue of reasonable cause should be submitted to the jury. *Kleinberg v. Clements*, No. CIV.A. 09-4924 NLH, 2012 WL 1019290, at *7 (D.N.J. Mar. 23, 2012) (citing *Roth v. Golden Nugget Casino/Hotel, Inc.*, 576 F. Supp. 262, 268 (D.N.J. 1983)). Second, viewing the encounter in Gurvey's bedroom in the light most favorable to Gurvey, there is not enough support to justify granting Defendants' summary judgment motion.

Defendants assert that they had probable cause to detain Gurvey for purposes of a psychiatric evaluation based on Dr. Marino's phone call to the Police Department and the fact that Gurvey was "clearly agitated and threatening to call other law enforcement officers." (Def. MSJ at 16.) This omits key context, however, that the Officers first encountered Gurvey when he just left the shower (clad only a towel) and was on a phone call with his doctor's office.  (DE 22-4, Ex. C, T39:16-39:23). Gurvey initially asked "what the hell" the Officers were doing in his bedroom, evincing some understandable agitation and surprise. Then, however, Gurvey attempted to deescalate the situation when the Officers explained the purpose of their visit. (Def. SOMF ¶¶ 22-25.) Defendants do not specifically identify any other statements or actions by Gurvey suggesting that Gurvey was a danger to himself and others, or was otherwise mentally unwell.

On this record, it is for the jury to decide whether the Officers were justified or not justified in requiring a psychiatric evaluation pursuant to N.J.

---

enforcement officer to request a mental health screening for an individual, based on reasonable cause.

For this reason, I reject the Defendants' suggestion that Gurvey was not subject to a "civil commitment" or that the Complaint does not assert a cause of action related to his "civil commitment." The allegations in the Complaint, Gurvey's motion, and the evidence submitted by both parties make it undoubtedly clear that the Officers forced Gurvey to undergo a psychiatric evaluation, therefore implicating N.J. Stat. Ann. § 30:4-27.6.

Stat. Ann. § 30:4-27.6. Depending on how they find the facts, a reasonable jury could go either way.

I must deny summary judgment in favor of Montclair with respect to the false arrest and false imprisonment claim. It is true that a municipality cannot be liable for "the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. Ann. § 59:2-10. Thus many intentional torts might be ruled out. *See also Hoag v. Brown*, 397 N.J. Super 34, 54 (N.J. App. Div. 2007). The tort of false arrest or imprisonment, however, can be committed either negligently or intentionally. An officer "need not act in bad faith or with intentional or willful disregard of a person's rights; rather, the officer may falsely imprison a person through mere negligence." *Merman v. City of Camden*, 824 F. Supp. 2d 581, 598 (D.N.J. 2010) (citing *Adams v. City of Camden*, 461 F. Supp. 2d 263, 270 (D.N.J. 2006)); *see also Maurello v. U.S.*, 111 F. Supp. 2d 475, 482 n.  (D.N.J. 2000) ("To allege a cause of action for false imprisonment, it matters not whether the defendant acted with malice or bad faith; a person will be liable for false imprisonment even if he negligently believes that his confining of plaintiff is justified."). If the Officers are found by a jury to have committed false arrest or imprisonment without willful misconduct, Montclair might be held liable.  Therefore, the Court cannot absolve Montclair of liability at the summary judgment stage.

Accordingly, both sides' motions for summary judgment regarding Gurvey's claims for false arrest and imprisonment are denied.

### D. Claims Under State Criminal Law

Count 4 of the Complaint asserts purported causes of action for "Obstruction of Justice", N.J. Stat. Ann. § 2C:29-1,[20] "False Reporting," N.J.

---

[20]    Titled "Obstructing administration of law or other governmental function" under The New Jersey Code of Criminal Justice. Neither the Complaint nor Gurvey's papers cite a specific statute in support of his obstruction of justice claim. For purposes of resolving this motion, I assume that Gurvey similarly pursues this cause of action under New Jersey criminal code. N.J. Stat. Ann. § 2C:29-1.

Stat. Ann. § 2C:28-4,[21] and "Tampering With Public Record," N.J. Stat. Ann. § 2C:28-7. (Compl. ¶¶ 101-104.)[22] Those are New Jersey criminal statutes that do not provide a private right of action. *See Jarrell v. Kaul*, 223 N.J. 294, 307-308 (N.J. 2015) (stating that "[i]n the absence of strong indicia of a contrary [legislative] intent, we are compelled to conclude that [the Legislature] provided precisely the remedies it considered appropriate") (quotation marks and ciations omitted); *Coleman v. New Jersey Transit Headquarters*, 846 F. App'x 167, 168 (3d Cir. 2021) ("We agree with the District Court's conclusion that Coleman failed to state a claim because the criminal statutes … relied upon do not create a private right of action."); *Barthakur v. Olszyk*, No. CV 16-1995-BRM-DEA, 2017 WL 507228, at *3 (D.N.J. Feb. 7, 2017) ("When a statute is silent on the question, New Jersey courts are "generally loath to imply a civil remedy from a penal statute.") (citation omitted).[23] Accordingly, summary judgment is granted in favor of Defendants with respect to Count 4.

### E. Motion to Bar Plaintiff's Expert Reports and Testimony

Defendants contend that Gurvey's expert reports must be excluded as "net opinions" and barred at trial. Specifically, the Defendants take issue with

---

[21]    Titled "False reports to law enforcement authorities" under The New Jersey Code of Criminal Justice.

[22]    Titled "Tampering with public records or information" under The New Jersey Code of Criminal Justice.

[23]    The Court takes note of Gurvey's arguments with respect to Counts 3 and 4, pertaining to the New Jersey Civil Rights Act ("NJCRA"), which provides a "private cause of action against individuals who are acting under color of law." Plfs. Mot. at 29-30. It is unclear whether Gurvey means to argue that the NJCRA provides a private cause of action for individuals to sue under New Jersey criminal statutes, or whether Gurvey asserts separate constitutional and state-law tort claims under the NJCRA. Either way, the fact remains that Gurvey did not assert claims under the NJCRA in his complaint. It seems that Gurvey first asserted a constitutional violation with respect to his false arrest claim in his opposition to Defendants' motion for summary judgment, while also stating that the false arrest claim sounds in tort (*i.e.,* no longer citing to N.J. Stat. Ann. § 2C:29-1, a criminal statute). Because the proper procedure for Gurvey to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a), the Court will not consider these reformulations of the claims on summary judgment. *Heyman v. Citimortgage, Inc.*, No. 14-1680-KM-MAH, 2019 WL 2642655, at *19 (D.N.J. June 27, 2019)

two expert reports. The first, from Stan V. Smith, Ph.D, is essentially a damages opinion, in which Dr. Smith calculates "the value of certain losses" because of the "falsified" Incident Report, including lost wages and employee benefits and reduction in value of life. (DE 33-7, Ex. 4). The second, from R. Paul McCauley, Ph.D, analyzes "the police operations on August 31, 2018," and offers various summary opinions related to the Police Department's actions. (DE 33-7, Ex. 16). Because the expert reports were not directly relevant to the resolution of the cross-motions for summary judgment, I will deny the Defendants' request without prejudice. Defendants may reassert this argument as a motion *in limine* nearer in time to trial, or at trial. They are reminded that the admissibility of expert testimony in federal court is not governed by the New Jersey "net opinion" rule, but by the Federal Rules of Evidence.

## IV.   Conclusion

For the reasons set forth above, I will grant in part and deny in part Defendants' motion for summary judgment, deny Defendants' motion to bar Plaintiff's expert reports and testimony and deny Gurvey's motion for summary judgment.

Dated: March 31, 2022

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**